## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| **BLUE BOX AIR, INC.,** | |
| Plaintiff, | C.A. No. ___4:26-cv-498___ |
| v. | |
| **BIOCOIL PRO, LP,** | **JURY TRIAL DEMANDED** |
| **Ross Lampe,** | |
| Defendants. | |

## COMPLAINT

Plaintiff Blue Box Air, Inc. ("Blue Box" or "Plaintiff"), by and through undersigned counsel, allege as follows for its Complaint against Defendants BioCoil Pro, LP ("BioCoil") and Ross Lampe ("Lampe") (collectively "Defendants"):

### THE PARTIES

1. Plaintiff Blue Box Air, Inc. is a Delaware corporation registered with its principal place of business located at 2016 Farrington Street, Dallas, TX 75207.

2. Defendant Biocoil Pro, LP is a Texas corporation with its principal place of business located at 4916 Camp Bowie Blvd., Fort Worth, TX 76107.

3. Ross Lampe is an individual residing in Texas. On information and belief, Lampe resides in the Fort Worth area and regularly works from 4916 Camp Bowie Blvd., Fort Worth, TX 76107.

1

4900-8935-0801.5

## NATURE OF THE DISPUTE

4.      This is an action for patent infringement, trade secret misappropriation, breach of contract, and other state law claims arising from Defendant Biocoil's patent infringement, unauthorized use of Blue Box's trade secrets, and attempts to trade off the goodwill associated with Blue Box's business.

## JURISDICTION & VENUE

5.      This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a) as this action arises under the Patent Act, 35 U.S.C. § 1 et seq., and other federal laws. The Court also has supplemental jurisdiction over Plaintiff's related state law claim under 28 U.S.C. § 1367 as those claims are so related to the federal claims that they form part of the same case or controversy.

6.      The Court has personal jurisdiction over Defendants as Defendants have purposefully directed infringing and unlawful activities toward, and conducted business within, the State of Texas and this District. BioCoil operates and is incorporated in this Judicial District, and has sold, offered for sale, and performed its services to customers throughout at least the State of Texas. Lampe resides in this Judicial District, and is the Managing Partner of BioCoil. Additionally, upon information and belief, Defendants regularly enter into contracts, and transact business, with businesses operating within the State of Texas. Further, BioCoil has designated as its registered agent for service in the State of Texas as The Faciane Law Firm, LP located at 4916 Camp Bowie Blvd, Fort Worth, TX 76107.

7.      Venue is proper in this District under 28 U.S.C. § 1391, as Defendants reside within the Northern District of Texas with BioCoil's principal place of business address listed as 4916 Camp Bowie Blvd., Fort Worth, TX 76107 and are subject to personal jurisdiction in this Judicial District.

4900-8935-0801.5

**PATENT IN SUIT**

8.      Plaintiff is the owner of United States Patent No. 10,480,875 (the "'875 Patent" or "Asserted Patent"), entitled *Method and system for cleaning heating, ventilation and air conditioning systems*, which the U.S. Patent and Trademark Office duly and lawfully issued on November 19, 2019. The U.S. Patent and Trademark Office issued the '875 Patent in full compliance with Title 35 of the United States Code. The '875 Patent is valid and enforceable. A true and correct copy of the '875 Patent is attached hereto as Exhibit A.

**BACKGROUND**

**Blue Box Air Recognized a Need for Cleaning the Deep Internal Surface of HVAC Coils**

9.      Heating, ventilation, and air conditioning (HVAC) systems are among the largest consumers of energy in commercial and residential buildings and play a critical role in indoor air quality and occupant health. Central to HVAC performance are heat-transfer coils, whose efficiency depends on clean, unobstructed surfaces that allow air to flow freely and exchange heat effectively.

10.      Heat-transfer coils accumulate dirt, grease, and microbial biofilms deep within their tightly packed fin structures. Because modern HVAC coils are dense, sealed, and often up eighteen (18) inches deep, the vast majority of their internal surface area has historically been inaccessible to effective cleaning. Conventional HVAC cleaning techniques such as pressure washing and steam treatment are inadequate to address this problem.

11.      Founded in 2016, Blue Box Air was built on a simple but powerful belief: HVAC coil cleaning should not be a cosmetic rinse, but a deep, restorative process that materially improves system performance and delivers lasting energy cost savings.

12.     Blue Box Air invested significant resources in research and development. Blue Box Air's goal: to develop a cleaning solution capable of penetrating the full depth of densely packed coils. The result: Blue Box Air's patented restoration process.

13.     Blue Box Air's process involves applying special cleaning foam containing enzymes.



Source: https://blueboxair.com/direct-service/

14.     This foam is applied while the HVAC system remains *fully operational*, enabling it to penetrate deep into the coils where it actively breaks down and removes biofilm and entrenched contaminants as it moves completely through the coil structure.

4900-8935-0801.5



Source: https://blueboxair.com/direct-service/

15.    Blue Box Air services its clients with this process today, having treated over 43,000 coils in over 1,000 buildings. *See* https://blueboxair.com/the-musty-building-mystery-how-blue-box-solves-the-hidden-hvac-problem/

**Blue Box Air Patents its Intellectual Property**

16.    After years of investment, risk, and innovation, Blue Box Air became a leader in HVAC cleaning. To protect its intellectual property, Blue Box Air applied for, and received, several patents, including the Asserted Patent, covering its inventions.

17.    Since at least April 2020, Blue Box Air has given the public, including BioCoil, notice of its patented technology through advertising on its website and press releases. *See* https://web.archive.org/web/20200411174221/https://blueboxair.com/.

18.    Plaintiff is the current owner of all rights, title, and interest in the '875 Patent.

19.    Plaintiff practices the '875 Patent through its HVAC cleaning service to its clients in the United States.

5

20.     BioCoil's founder, Ross Lampe, also knows of the patented technology by virtue of his prior employment with Blue Box Air.

21.     Upon information and belief, Lampe has specifically known about the '875 Patent since at least February 11, 2022, when Lampe was hired by BlueBox Air. As the director of business development Lampe was intimately familiar with Blue Box Air's intellectual property and proprietary information including sales strategy, technology and customer base.

22.     While employed, Lampe became familiar with Blue Box Air's patented technology and promoted such proprietary technology in order to win business for Blue Box Air.

**BioCoil Infringes the '875 Patent through its Concentrate Product**

23.     Lampe was terminated from Blue Box Air. Lampe went on to found BioCoil.[1]

24.     Because of Blue Box Air's success, Lampe brought a copycat product to market that infringes on Blue Box Air's intellectual property.

25.     According to BioCoil's website, BioCoil launched a new product no later than March 1, 2025.

> BioCoil HOME is the ultimate solution for mechanical contractors looking to provide residential clients with safer, more effective HVAC coil cleaning. Designed for professional use, BioCoil Home delivers outstanding results, helping contractors enhance system performance and indoor air quality for their customers.

Source: https://web.archive.org/web/20250301095617/https://biocoilhome.com/

26.     BioCoil began offering this product and service, advertised as BioCoil HOME, as well as BioCoil Pro, as services for cleaning HVAC systems. Such services include applying a

---

[1] Upon information and belief, BioCoil Pro, LP owns and operates BioCoilHome, Inc. and BioCoilPro, LLC, that advertise the BioCoil Home and BioCoil Pro products respectively.

4900-8935-0801.5

cleaning foam to HVAC systems as described on BioCoil's websites at biocoilpro.com and biocoilhome.com. Such HVAC cleaning services as advertised on those websites are collectively referred to as the "Accused Product".

27.    With at least the launch of the Accused Product BioCoil infringes the '875 Patent. Furthermore, BioCoil induces its end users to infringe one or more claims of the '875 Patent and contributes to its end users' infringement of one or more claims of the '875 Patent.

**BioCoil and its end users infringe the '875 Patent**

28.    The Accused Product infringes one or more claims of the '875 Patent, including at least claim 4.



Source: https://biocoilhome.com/



7

Source: https://biocoilhome.com/

29.    The Accused Product includes "applying a cleaning foam containing enzymes that break down biofilm into a plurality of spaces between or within one or more heat-transfer coils of a heat exchange system of the HVAC system, the heat exchange system having a front side for air intake during operation of the HVAC system and a back side through which air exits during the operation of the HVAC system, wherein the cleaning foam is applied to the front side of the heat exchange system." For example, the Accused Product is applied to coil surfaces.



Source: https://allmountain.b-cdn.net/pdf/BioCoil%20Home%20Brochure%20Case%20Print.pdf (annotated).[2]

30.    The Accused Product includes a cleaning foam.

The Next Generation of Coil Cleaner Starts Here.
No dyes. No gimmicks. Just thick foam powered by biology, designed to restore HVAC performance and protect what matters most.

Source: https://biocoilhome.com/ (annotated).

31.    The Accused Product includes applying probiotics with enzymes that break down biofilm.

---

[2] Citations to and images from BioCoil's biocoilhome.com website are exemplarly and apply equally to BioCoil's biocoilpro.com website.



Source: https://biocoilhome.com/ (annotated).

32.    The Accused Product includes applying the foam into a plurality of spaces between or within one or more heat-transfer coils of a heat exchange system of the HVAC system.



Source: https://biocoilhome.com/ (annotated).

4900-8935-0801.5



**Probiotic Cleaners**

**How They Work**: Probiotic cleaners like BioCoil HOME introduce billions of beneficial bacteria that immediately begin to outcompete harmful microbes for space and nutrients, helping prevent biofilm formation and reduce odors at the source. As these probiotics establish themselves on HVAC coil surfaces, they produce enzymes that break down the organic matter such as skin cells, oils, and residue trapped in dust that biofilms rely on to grow. By removing this buildup, BioCoil HOME helps restore airflow improve heat transfer, and support optimal system performance, all without the use of harsh chemicals.

Source: https://biocoilhome.com/ (annotated).



**BioCoil Home**                                        **SAFETY DATA SHEET**

**1. PRODUCT AND COMPANY IDENTIFICATION**

Product Identifier
**Product Name:**                          **BioCoil Home Probiotic Biosurfactant HVAC Coil Cleaner**
Product Code:                              ZB/BCH/001P           (0001 signifies container size)
Other means of identification:            None

Recommended use of the chemical and restrictions on use
Recommended Use: Residential HVAC Coil Cleaning      Cleaning agent
Uses advised against:                                Use only as stated on label
Product Dilution: Dilute 1:10

Source: https://allmountain.b-cdn.net/pdf/SDS%20BioCoil%20Home.pdf (annotated).

- For best results, use mechanical agitation such as the unit's airflow to help distribute the product evenly across the coil surfaces and reach deeper areas.
- Allow the product to penetrate for 5-10 minutes. The probiotics and biosurfactants will continue working as the system runs, breaking down dirt and contaminants.

Source: https://allmountain.b-cdn.net/pdf/BioCoil%20Home%20Brochure%20Case%20Print.pdf (annotated).

4900-8935-0801.5

33.    The foam for the Accused Product is applied to a HVAC heat exchange systems, which includes "a front side for air intake during operation of the HVAC system and a back side through which air exits during the operation of the HVAC system." For example, the foam is applied to the front side of the heat exchange system and allowing the "unit's airflow" to pull the cleaning solution throught he system, including the back side of the system.

- Spray BioCoil Home evenly onto the coil surfaces, following the recommended manufacturers' guidelines for coil access and cleaning procedures.
- For best results, use mechanical agitation such as the unit's airflow to help distribute the product evenly across the coil surfaces and reach deeper areas.
- Allow the product to penetrate for 5-10 minutes. The probiotics and biosurfactants will continue working as the system runs, breaking down dirt and contaminants.
- No rinsing is needed—just let your HVAC system operate as usual for ongoing cleaning.

Source: https://allmountain.b-cdn.net/pdf/BioCoil%20Home%20Brochure%20Case%20Print.pdf (annotated).

34.    The infringing service is applied during operation of the HVAC system.

**Application Instructions**
- BioCoil Home can be safely applied while your HVAC unit is running (optional) or turned off, depending on your preference.

Source: https://allmountain.b-cdn.net/pdf/BioCoil%20Home%20Brochure%20Case%20Print.pdf (annotated).]

35.    The Accused Product includes "causing or allowing the cleaning foam to pass through the plurality of spaces." For example, the Accused Product is designed to be used in conjunction with a running HVAC system that causes the foam to pass through the coils, including spaces between coils.

4900-8935-0801.5

- Spray BioCoil Home evenly onto the coil surfaces, following the recommended manufacturers' guidelines for coil access and cleaning procedures.
- For best results, use mechanical agitation such as the unit's airflow to help distribute the product evenly across the coil surfaces and reach deeper areas.
- Allow the product to penetrate for 5-10 minutes. The probiotics and biosurfactants will continue working as the system runs, breaking down dirt and contaminants.
- No rinsing is needed—just let your HVAC system operate as usual for ongoing cleaning.

Source: https://allmountain.b-cdn.net/pdf/BioCoil%20Home%20Brochure%20Case%20Print.pdf (annotated).

36.     The Accused Product also inclusdes "the cleaning foam breaking down and removing dirt or debris from surfaces adjacent to the plurality of spaces, the enzymes assisting in breaking down biofilm if present." For example, the applied foam includes probiotics and enzymes that break down and removes skin cells, oils, and residue trapped in dust that biofilms rely on to grow.



**Probiotic Cleaners**

**How They Work**: Probiotic cleaners like BioCoil HOME introduce billions of beneficial bacteria that immediately begin to outcompete harmful microbes for space and nutrients, helping prevent biofilm formation and reduce odors at the source. As these probiotics establish themselves on HVAC coil surfaces, they produce enzymes that break down the organic matter such as skin cells, oils, and residue trapped in dust that biofilms rely on to grow. By removing this buildup, BioCoil HOME helps restore airflow, improve heat transfer, and support optimal system performance, all without the use of harsh chemicals.

4900-8935-0801.5

Source: https://biocoilhome.com/ (annotated).

37.     The Accused Product includes "the cleaning foam carrying away the removed dirt or debris, and biofilm if present, from the plurality of spaces and exiting the back side of the heat exchange system with the removed debris." For example, the Accused Product removes the buildup of skin cells, oils, and residue that biofilms rely on to grow. No rinsing is needed. The running HVAC system will push the foam through the coils and out the other side.



Source: https://biocoilhome.com/ (annotated).

- Spray BioCoil Home evenly onto the coil surfaces, following the recommended manufacturers' guidelines for coil access and cleaning procedures.
- For best results, use mechanical agitation such as the unit's airflow to help distribute the product evenly across the coil surfaces and reach deeper areas.
- Allow the product to penetrate for 5-10 minutes. The probiotics and biosurfactants will continue working as the system runs, breaking down dirt and contaminants.
- No rinsing is needed—just let your HVAC system operate as usual for ongoing cleaning.

Source: https://allmountain.b-cdn.net/pdf/BioCoil%20Home%20Brochure%20Case%20Print.pdf (annotated).



Source: https://www.youtube.com/watch?v=cLmHVvtTnvY at 0:27.



14

Source: https://www.youtube.com/watch?v=cLmHVvtTnvY at 1:35

38.    BioCoil also encourages customer to use the Accused Product in an infringing manner, including at least claim 4 of the '875.

39.    For example, BioCoil provides a brochure and training via video demonstration of the Accused Product and how to operate it for end-users as shown above.

40.    Through BioCoil's advertisements by at least its webpage, there are many end users who have directly infringed at least claim 4 of the '875 Patent by at least using the Accused Product by way of BioCoil's instruction.

41.    BioCoil has, under 35 U.S.C. § 271(b), induced infringement and continues to induce infringement of the '875 Patent.

42.    BioCoil has recommended, encouraged, and promoted the infringing use of the Accused Product in the United States.

43.    On information and belief, BioCoil acted with intent to encourage others to directly infringe the '875 Patent by encouraging the use of the Accused Product in an infringing manner.

44.    BioCoil has been on notice of infringement of the '875 Patent at least as early as February 2022, when Lampe was employed by Blue Box Air and became familiar with its intellectual property, including the claims of the '875 Patent.

45.    Despite knowing of the '875 Patent, BioCoil has sold and continues to sell and offer for sale the Accused Product.

46.    BioCoil's websites include a brochure with instructions regarding how to use the Accused Product in an infringing manner.

4900-8935-0801.5



Source: https://biocoilhome.com/

47.    BioCoil's distribution of the Accused Product with instruction brochures constitutes active inducement under § 271(b).

48.    The brochure instructs users on how to use the infringing sevice, which induces infringement of at least claim 4 of the '875 Patent.

49.    On information and belief, BioCoil directs its customers to this website and brochure, constituting active inducement under § 271(b).

50.    BioCoil's conduct is done with knowledge of the '875 Patent, and, on information and belief, BioCoil has engaged in such activities knowing its customers would infringe the '875 Patent.

51.    On information and belief, BioCoil has, under 35 U.S.C. § 271(c), engaged in contributory infringement, and continues to contribute to infringement of the '875 Patent.

52.    Accused Product is not a staple article or commodity of commerce.

53.    Accused Product has no substantial non-infringing use.

54.    BioCoil does not advertise the Accused Product in a way other than its infringing use.

55.    BioCoil offers to sell and sells the Accused Product within the United States.

56.    Accused Product is a HVAC cleaning product for the use in practicing at least claim 4 of the '875 Patent.

57.    BioCoil encourages users to perform infringing acts, by instructing users how to use the Accused Product.

4900-8935-0801.5

58.    While having knowledge of the '875 Patent, BioCoil has encouraged users to perform infringing acts.

59.    BioCoil knows the Accused Product is especially made for use in infringement of at least claim 4 of the '875 Patent.

60.    BioCoil knew or should have known that its actions constitute infringement of the '875 Patent, and has had such knowledge since at least February 11, 2022.

61.    As a result, BioCoil's infringement of the '875 Patent has been, and continues to be, willful.

**BioCoil's Infringement is Willful**

62.    BioCoil's decision to copy Blue Box's patented solution is no accident. BioCoil competes directly with Blue Box in the HVAC cleaning space. Further, BioCoil not only copied Blue Box's product but clearly incorporated Blue Box's wording and messaging in its own marketing.

63.    For example, as shown below, a comparison of BioCoil's marketing materials with earlier Blue Box marketing demonstrates that BioCoil adopted the same "penetrate" and "deep in the coils" language. This mirrors Blue Box Air's distinctive messaging.

Blue Box solves how to penetrate deep coils With our patented process, the Blue Box system injects an odorless and chemical free enzyme foam into the coils **while the system is on.**

Source: https://blueboxair.com/blue-box-biotreatment-process/ (annotated).

- For best results, use mechanical agitation such as the unit's airflow to help distribute the product evenly across the coil surfaces and reach deeper areas.
- Allow the product to penetrate for 5-10 minutes. The probiotics and biosurfactants will continue working as the system runs, breaking down dirt and contaminants.

Source: https://allmountain.b-cdn.net/pdf/BioCoil%20Home%20Brochure%20Case%20Print.pdf (annotated).

17

4900-8935-0801.5

64. BioCoil's goal was to copy Blue Box's product, presentations, and marketing. After copying Blue Box's product and marketing, BioCoil rolled out the Accused Product. However "new" BioCoil may claim its product to be, its cleaning solution and method of application is claimed in the '875 Patent and practiced by Blue Box.

65. BioCoil's infringement of Blue Box's patented solution and method has been intentional and knowing.

66. For example, Lampe, the founder of BioCoil, is a former employee of Blue Box as the director of business development. In this role, Mr. Lampe would have certainly advertised Blue Box's patented technology in order to win business for Blue Box.

67. Blue Box and Lampe executed an At-Will Employee Agreement (the "Employment Agreement"). *See* Exhibit B. The Employment Agreement defines Confidential Information and prohibits Lampe from misusing Blue Box's Confidential Information for any purpose other than the authorized use as articulated in the Employment Agreement.

68. When Lampe cut ties with Blue Box, the parties executed a second agreement (the "Separation Agreement"). *See* Exhibit C. The Separation Agreement provides that Lampe has returned all of Blue Box's property in his possession. The Separation Agreement also acknowledges that Lampe had access to Blue Box's confidential and proprietary information and agreed to not disclose any of this information for any purpose or reason.

69. Biocoil's acts are causing and, unless restrained, will continue to cause damage and immediate irreparable harm to Blue Box and to its valuable reputation and goodwill with the consuming public for which Blue Box has no adequate remedy at law.

**COUNT ONE**
**Patent Infringement (35 U.S.C. § 271) – U.S. Patent No. 10480875**
**(the "'875 Patent")**

18

*Against Defendant BioCoil Pro, LP*

70.    Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

71.    Plaintiff holds all substantial rights in the '875 Patent, including the right to make, use, sell, offer for sale, and import the patented inventions, as well as the right to sue and recover for infringement.

72.    Defendant, without license or authority, has directly infringed and continues to directly infringe one or more claims of the '875 Patent under 35 U.S.C. § 271(a) by making, using, offering for sale, and selling products that practice the claimed invention.

73.    As described above, at least claim 4 of the '875 Patent is infringed by Defendant's product, BioCoil Home, which is a cleaning foam advertised to "apply" to coil surfaces and includes probiotics that produce enzymes that break down biofilm on HVAC coil surfaces and other characteristics recited in the patent claim.

74.    Defendant's infringement is willful. Defendant became aware of the '875 Patent during Lampe's employment at Blue Box and despite this knowledge, Defendant has sold and continues to sell and offer for sale the BioCoil Home product in blatant disregard of Plaintiff's rights.

75.    As a direct and proximate result of Defendant's infringement, Plaintiff has suffered and will continue to suffer irreparable harm and damages, including loss of market share, lost sales, and reputational injury.

4900-8935-0801.5

**COUNT TWO**
**Misappropriation of Trade Secrets**
**(Defend Trade Secrets Act - 18 U.S.C. § 1836(b))**
*Against All Defendants*

76.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

77.     Plaintiff owns and protects trade secrets within the meaning of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b). These trade secrets include, but are not limited to: customers, product sourcing information, know-how regarding Blue Box Air's technology, and market stategies.

78.     Plaintiff took reasonable measures to maintain the secrecy of these trade secrets, including limiting access to need-to-know personnel and requiring written confidentiality agreements.

79.     On information and belief, Defendant used and/or disclosed Plaintiff's proprietary information maliciously and in willful and conscious disregard of the rights of Plaintiff.

80.     As a direct and proximate result of Defendant's willful, improper, and unlawful use and disclosure of Plaintiff's proprietary information, Plaintiff suffered actual loss.

81.     As a direct and proximate result of Defendant's willful, improper, and unlawful use and disclosure of Plaintiff's proprietary information, Defendant was unjustly enriched, and it enjoyed and continues to enjoy an unfair competitive advantage at Plaintiff's expense. Defendant will continue to be unjustly enriched unless enjoined from further use of Plaintiff's trade secrets.

82.     Furthermore, these acts of Defendant wrongfully misappropriating Plaintiff's proprietary information was and continues to be willful and malicious, warranting an award of exemplary damages, as provided by 18 U.S.C. § 1836(b)(3)(C) and an award of attorneys' fees, as provided by 18 U.S.C. § 1836(b)(3)(D).

4900-8935-0801.5

**COUNT THREE**
**Misappropriation of Trade Secrets**
**(Texas Uniform Trade Secrets Act)**
*Against All Defendants*

83.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

84.     Plaintiff owns and protects trade secrets within the meaning of the Texas Uniform Trade Secrets Act ("TUTSA"), Tex. Civ. Prac. & Rem. Code § 134A.002(6). These trade secrets include, but are not limited to: customers, product sourcing information, know-how regarding Blue Box Air's technology, and market stategies.

85.     Plaintiff took reasonable measures to maintain the secrecy of these trade secrets, including limiting access to need-to-know personnel and requiring written confidentiality agreements.

86.     Defendant acquired Plaintiff's trade secrets as an employee of Plaintiff's and then unlawfully took Plaintiff's trade secrets following the end of his employment. Defendant then knowingly and improperly used these trade secrets for its own commercial gain in violation of TUTSA.

87.     Without limitation, Defendant misappropriated Plaintiff's trade secrets by:

   a.   Replicating Plaintiff's products;

   b.   Abusing access to Plaintiff's facility to steal and misuse Plaintiff's proprietary information;

   c.   Manufacturing, marketing, and sellng products derived from these misappropriated trade secrets under Defendant's company name causing customer confusion and diverting sales.

21

88.     Defendant is directly liable for misappropriation because it acquired and used Plaintiff's trade secrets in operations, including manufacturing and selling products derived from Plaintiff's formulations.

89.     Defendants' misappropriation was willful and malicious, undertaken with knowledge that their use of Plaintiff's trade secrets was unauthorized.

90.     As a direct and proximate result of Defendants' misappropriation, Plaintiff has suffered significant damages, including lost sales, diverted customers, loss of market share, reputational harm, and costs related to stolen/damaged property.

91.     Defendant's ongoing misuse of Plaintiff's trade secrets threatens to cause continuing and irreparable harm for which there is no adequate remedy at law.

92.     Plaintiff is entitled to damages (including actual losses and unjust enrichment), exemplary damages for willful and malicious misappropriation, attorneys' fees, and injunctive relief under TUTSA.

## COUNT FOUR
### Breach of Contract
*Against All Defendants*

93.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

94.     As set forth above, Plaintiff and Mr. Lampe executed a valid and enforceable Employment Agreement (the " Employment Agreement") which prohibited use of Plaintiff's Confidential Information for any purpose other than those permitted by Plaintiff in furtherance of work for Blue Box. *See* Exhibit B, p. 3.

95.     The Confidential Information disclosed under the Agreement included the pricing extended or offered to customers, any written material regarding customer preferences, plans or

22

proposals prepared for customers, current or prospective customer lists, company work product, work product in development, quotes, estimates, proposals, methods, techniques, drawings, sketches, renderings, huring or reduction in force plans, company and/or customer costs or pricing, supplier costs or contracts, financial data, partnership or joint venture agreement terms, product or campaign enhancements, strategic initiatives, investment opportunities or plans, enterprise valuations and employee benefit plans and agreements. *See* Exhibit B, p. 2.

96.   Defendant materially breached the Employment Agreement by using Plaintiff's Confidential information to develop its products, which Defendant then used to manufacture, market, and sell its competing product.

97.   As set forth above, Plaintiff and Mr. Lampe executed the Separation Agreement which prohibited use of Plaintiff's Confidential Information following Mr. Lampe's departure from Blue Box. *See* Exhibit C, p. 4.

98.   Defendant materially breached the Separation Agreement by using Plaintiff's Confidential information to develop its products, which Defendant then used to manufacture, market, and sell its competing product.

99.   By misusing Plaintiff's Confidential Information to create its product, Defendant exceeded the scope of permitted use directly violated its contractual obligations.

100.   Additionally, the Separation Agreement included an obligation to return all records, documents, etc. to Plaintiff following the separation agreement.

101.   Lampe was provided a laptop, which included access to confidential information. Instead of returing the laptop to Plaintiff as required, Lampe digitally wiped all data from the computer, destroying Plaintiff's confidential information stored on the computer as well as any

record of how, when, and where Lampe accessed Plaintiff's confidential information on said laptop.

102.     Lampe' s destruction of the laptop information is a breach of the Separation Agreement by failing to return Plaintiff's property and demonstrates Lampe's willful misappropriation to cover his tracks in misappropriating Plaintiff's trade secrets.

103.     As a result of Defendant's breaches, Plaintiff has suffered harm, including lost sales, erosion of market share, diverted business opportunities, and damage to its reputation and goodwill.

104.     The Agreements expressly provide that breach entitles the non-breaching party to injunctive relief as well as damages. Plaintiff accordingly seeks all available legal and equitable remedies for Defendant's contractual breaches.

## DEMAND FOR JURY TRIAL

105.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Blue Box Air, Inc. demands a trial by jury on all issues so triable as to the above Complaint.

## PRAYER FOR RELIEF

106.     Wherefore, Plaintiff Blue Box Air, Inc. requests that this Court:

   i.     Enter judgment in favor of Plaintiff on all counts;

   ii.    Enter a permanent injunction restraining Defendant and its respective officers, directors, employees, agents, affiliates, successors, assigns, franchisees, licensees and all those in privity or acting in concert with Defendant from:

   a) Infringing Plaintiff's Patent;

   b) Misappropriating and/or using Plaintiff's trade secrets and confidential information;

24

iii.   An Order requiring Defendant to return all of Plaintiff's Confidential Information, including trade secrets, formulas, and confidential business information.

iv.   An Order impounding all business records, ledgers, communications, and digital files related to Defendant's infringing and misappropriating activities, pending accounting and discovery.

v.   An accounting of all revenues, profits, and financial benefits derived by Defendant from its infringing and misappropriating activities.

vi.   An award of compensatory damages in an amount to be determined at trial, including but not limited to:

a.   lost profits and loss of market share;

b.   damages resulting from patent infringement and trade secret misappropriation;

c.   harm to Plaintiff's reputation and goodwill.

vii.   An award of enhanced/exemplary/punitive damages in an amount to be determined at trial, including but not limited to:

a.   Enhanced damages for willful patent infringement under 35 U.S.C. § 284;

b.   Exemplary damages for willful and malicious misappropriation of trade secrets;

viii.   An order impounding and requiring the destruction of all infringing products, packaging, molds, equipment, and promotional materials in Defendant's possession, custody, or control.

4900-8935-0801.5

ix.     An award of corrective advertising damages necessary to remedy customer confusion and rehabilitate Plaintiff's reputation in the marketplace.

x.      An award requiring Defendant to disgorge cost savings wrongfully obtained through misappropriation of Plaintiff's trade secrets and use of its property.

xi.     An order imposing a constructive trust on all revenues, profits, and assets derived from Defendant's infringing and misappropriating conduct.

xii.    An award of attorneys' fees, costs, and expenses as permitted under 35 U.S.C. § 285, TUTSA, and other applicable law.

xiii.   Pre- and post-judgment interest as allowed by law.

xiv.    Declaratory judgment affirming Plaintiff's rights and declaring Defendant's actions unlawful.

xv.     In the alternative, and to the extent permitted under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(2), an order authorizing the seizure of property, records, files, equipment, or other tangible or digital materials in Defendant's possession, custody, or control that embody or contain Plaintiff's trade secrets or confidential information, where necessary to prevent the propagation, dissemination, or destruction of such trade secrets.

xvi.    Such other relief as may be necessary to ensure that Defendant does not dissipate assets or evade the Court's orders, including appointment of a receiver or monitor if warranted.

xvii.   Such other and further relief this Court deems just and proper.

Dated: April 22, 2026                    Respectfully submitted,


By */s/ Robert T. Slovak*
Robert T. Slovak
Texas State Bar No. 24013523
rslovak@foley.com
J. Michael Thomas
Texas State Bar No. 24066812
jmthomas@foley.com
**FOLEY & LARDNER LLP**
2021 McKinney Ave. Suite 1600
Dallas, Texas 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667

**ATTORNEYS FOR BLUE BOX AIR, LLC**

27

4900-8935-0801.5